```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND

                                :
SAINEY TAMBEDOU                 :
                                :
     v.                         :   Civil Action No. DKC 19-2822
                                :
FUNDAMENTAL CLINICAL &          :
OPERATIONAL SERVICES, LLC       :
```

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case is the Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, filed by Defendant Fundamental Clinical & Operational Services, LLC ("Fundamental"). (ECF No. 6). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted.

**I.  Background**

Unless otherwise noted, the facts outlined here are set forth in the complaint and construed in the light most favorable to Plaintiff. Sainey Tambedou ("Mr. Tambedou") is an African American male from Gambia, West Africa. He holds a master's degree in Health Administration Informatics, a bachelor's degree in Nursing, numerous certifications, and is licensed as a Registered Nurse in the state of Maryland. Mr. Tambedou is highly knowledgeable in

healthcare assessment tools such as Minimum Data Set and Casemix clinical reimbursement.

Fundamental is a nationwide corporation which provides healthcare services.  On April 25, 2019, Mr. Tambedou received an offer of employment as Divisional Director of Clinical Reimbursement at Fundamental.  The position entailed providing services to various facilities in South Carolina, Indiana, Wisconsin, and Pennsylvania.  The offer letter stated Mr. Tambedou's salary and that he would be subject to a 90-day introductory period.  Mr. Tambedou accepted the employment offer that same day.[1]

Prior to accepting his offer of employment, Mr. Tambedou informed his future supervisor, Fran Chapman, that he had previously made plans to travel to Gambia between June 3 and June 7, 2019, to celebrate the Muslim holiday of Eid Fitr and his 50th birthday.  Ms. Chapman assured him "his travel plans would not cause an issue" and pre-approved him for paid time off.  (ECF No. 1 ¶ 7).  Ms. Chapman is a Caucasian female.

On May 20, 2019, Mr. Tambedou began his first day of work with Fundamental at the company's office in Sparks, Maryland.  From May 20 to May 21, 2019, Fundamental Senior Regulatory Specialist,

---

[1] Prior to joining Fundamental, Mr. Tambedou was the Director of Clinical Assessment Standards and Compliance at Integrace, a healthcare company.  Before Integrace, he worked a similar position at Sibley Memorial Hospital for sixteen years.

Jackie Hardison, trained Mr. Tambedou on systems access and administrative tasks such as entering timesheets and expense reports.  Ms. Hardison is a Caucasian female.  From May 22 to May 23, 2019, Fundamental Vice President of Clinical Infomatics, Jocelyn Plumridge, trained Mr. Tambedou on various electronic health record systems.  Ms. Plumridge is a Caucasian female.

The following week, on May 28, 2019, Mr. Tambedou traveled to Bell Tower Nursing Facility in Indiana to continue his orientation and training with Ms. Chapman.  Mr. Tambedou was previously scheduled to travel to facilities in South Carolina the following month.  However, upon his arrival at Bell Tower, Ms. Chapman immediately informed him that she would be reassigning the South Carolina facility to Ms. Plumridge and instructed him to cancel his travel plans to that facility.  Specifically, Ms. Chapman stated, "South Carolina, is a non-case mix state and it's all about accuracy.  I might give you New Mexico."  (*Id.*, ¶ 13).  Ms. Plumridge has no Minimum Data Set or Casemix expertise.

"Throughout their interaction at orientation, Ms. Chapman was aggressive condescending and demoralizing towards Mr. Tambedou." (*Id.*, ¶ 14).  Ms. Chapman "raised her voice at him" stating:

> "I heard you want to make changes!  You are not hired to change anything!  Just observe and send reports to me in bullet points!  You have all of these experiences, but it was for a smaller company!  Jocelyn will cover South Carolina.  Go ahead and send emails to []

3

>      travel to cancel your visit!  Make sure you
>      copy me on the email!"

(*Id.*).

Ms. Chapman rarely looked at Mr. Tambedou directly and spoke to him as if he had "difficulty with understanding" even though he "told [her] that he absorbs information fast." (*Id.*). Ms. Chapman informed other employees they should report directly to her because Mr. Tambedou "[wa]s still on orientation." (*Id.*). All of Mr. Tambedou's interactions with Ms. Chapman occurred within a two-hour time span on May 28, 2019.

Around 3:30 pm that day, Ms. Chapman commented that Mr. Tambedou could go back to his hotel room because, "[She] gave [him] several things to work on." (*Id.*, ¶ 15). Mr. Tambedou then returned to his hotel room, canceled his travel arrangements to the South Carolina facility, and "worked on the PowerPoint presentation for the Fiscal Year 2020 Resident Assessment Instrument[.]" (*Id.*). Mr. Tambedou "completed it on May 31, 2019 and shared it with the group." (*Id.*). He then traveled to Gambia for his pre-approved vacation.

On Friday, June 7, 2019, while Mr. Tambedou was still on vacation in Gambia, he received an email from Ms. Chapman notifying him he should not report to the office on Monday. She instead instructed him to dial into a conference call with her at that time.

4

When Mr. Tambedou joined the conference call on Monday, June 10, 2019, Ms. Chapman informed him that he did not meet expectations and that his "work style" did not match that of the company. (*Id.*, ¶ 17). Ms. Chapman then stated his employment had been terminated, effective immediately. Karen Miller, Regional Human Resources Director, then "joined the call and demanded that Mr. Tambedou provide his private email so that she could send him the severance letter." (*Id.*).

Mr. Tambedou responded that "he did not understand what expectations he had failed to meet during the mere six days of orientation" and that he was being "unfairly terminated."[2] (*Id.*). He added that he had 23 years of employment experience, expertise in the industry, and had left a corporate position to work at Fundamental. Ms. Chapman and Ms. Miller made no further comment and ended the conference call. Ms. Chapman then sent a mass email stating that Mr. Tambedou no longer worked for the company. Shortly thereafter, Mr. Tambedou received a separation agreement offering him two weeks of severance pay.

On September 25, 2019, Mr. Tambedou filed a four-count complaint against Fundamental. (ECF No. 1). The first count

---

[2] Mr. Tambedou was employed with Fundamental from May 20, 2019 to June 10, 2019. However, due to the Memorial Day holiday and a pre-approved vacation between June 3, 2019 and June 7, 2019, he only completed six business days of work on location at the company's facilities.

5

alleges a violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 for racial discrimination. The second count alleges a violation of the Maryland Fair Employment Practice Act, Md. Code Ann., State Gov't, §§ 20-606 *et seq*. The third count alleges breach of an employment contract. The fourth count alleges a claim for promissory estoppel. On November 27, 2019, Fundamental filed the presently pending motion to dismiss, or in the alternative, motion for summary judgment. (ECF No. 6). On January 2, 2020, Mr. Tambedou responded. (ECF No. 13). On January 27, 2020, Fundamental replied. (ECF No. 16).

## II. Standard of Review

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

"[W]hile a plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss, *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–15,(2002), '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Court of Appeals of Maryland*, 566 U.S. 30 (2012) (internal citations omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). In evaluating the complaint, unsupported legal allegations need not be accepted. *See Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the

7

pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.

## III. Analysis

Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). The statute broadly defines the term "make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Thus, to state a claim under § 1981, a plaintiff must establish "purposeful, racially discriminatory actions that affect at least one of the contractual aspects listed in § 1981(b)." *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018 (4th Cir. 1999).

"To establish a Title VII or § 1981 hostile work environment claim, the plaintiff must show that the offending conduct was (1) unwelcome; (2) based on race []; (3) subjectively or objectively pervasive enough to alter the plaintiff's condition of employment and create an abusive atmosphere; and (4) imputable to the employer." *Cepada v. Bd. of Educ. of Baltimore Cty.*, 814 F. Supp.

2d 500, 511 (D. Md. 2011). "The words 'hostile work environment' are not talismanic, for they are but a legal conclusion; it is the alleged facts supporting those words, construed liberally, which are the proper focus at the motion to dismiss stage." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). A court's determination of whether such an environment exists includes a consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Here, the basis of Mr. Tambedou's race discrimination claim is that Ms. Chapman was rude toward him during their interactions at his orientation, that she reassigned a facility previously allotted to him to his Caucasian colleague, and that he was terminated. As will be discussed, none of the three alleged violations is sufficiently pled.

First, Mr. Tambedou argues that Ms. Chapman was "aggressive, condescending, and demoralizing" toward him. (ECF No. 1, ¶ 14). He contends Ms. Chapman raised her voice at him, rarely looked at him directly, and spoke to him as if he had "difficulty with understanding." (*Id.*). Although Mr. Tambedou considered these

9

actions to be hostile and malicious, such discrete acts do not describe harassment severe or pervasive enough to support a hostile work environment claim. "[C]allous behavior by [one's] superiors," *Bass*, 324 F.3d at 765, and "personality conflict[s] with [one's] supervisor," *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000), do not rise to the level of a hostile work environment, and the hostile work environment claim will be dismissed.

Second, Mr. Tambedou insists the reassignment decision was based on race because Ms. Plumridge is Caucasian. This conclusion is nothing more than mere speculation. Simply asserting that a Caucasian candidate was selected for a role over an individual within a protected class, without any facts indicating discrimination, cannot support a claim of intentional discrimination. Such an allegation "is simply too conclusory" because "only speculation can fill the gaps in [plaintiff's] complaint." *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 586 (4th Cir. 2015). "While the allegation that non-Black decisionmakers [selected] non-Black [candidates] instead of the plaintiff is consistent with discrimination; it does not alone support a reasonable inference that the decisionmakers were motivated by bias." *Id.* "Indeed, the consequence of allowing [plaintiff's] claim to proceed on [his] complaint as stated would be that any qualified member of a

protected class who alleges nothing more than [he] was denied a position or promotion in favor of someone outside [his] protected class would be able to survive a *Rule 12(b)(6)* motion.  Such a result cannot be squared with the Supreme Court's command that a complaint must allege more than a sheer possibility that a defendant has acted unlawfully." *Id.*, at 588 (internal citations and quotations omitted).

Mr. Tambedou insists that he was more qualified to cover the facility than Ms. Plumridge because of his Casemix expertise.  Yet, he also states that when reassigning the facility to Ms. Plumridge, Ms. Chapman stated "South Carolina is a non-case mix state and its all about the accuracy." (ECF No. 1, ¶ 13).  Mr. Tambedou further states that Ms. Plumridge was a "long term employee[] of Fundamental." (*Id.*, ¶ 11).  Thus, the complaint itself not only fails to allege facts supporting race discrimination but also supplies reasons for the actions that had nothing to do with discrimination: Ms. Chapman may well have determined that Ms. Plumridge was better suited for the facility based on her experience.  Fundamental suggests just that in its papers.  (ECF No. 13, at 5 ("[T]his allegation indicates that the long-term employee would be better suited and more accurate in executing the assignment than Plaintiff.")).  Here, as in *McCleary-Evans*, "the cause that [Plaintiff] asks us to infer (*i.e.*, invidious discrimination) is not plausible in light of the "obvious

11

alternative explanation." 780 F.3d at 588. Accordingly, the claim based on reassignment of duties will be dismissed.

Third, and finally, Mr. Tambedou concludes that he was unfairly terminated by arguing he could not possibly have been fired for any reason other than his race given the short duration between starting orientation on May 20, 2019 and being fired on June 10, 2019. Throughout his complaint, however, Mr. Tambedou makes multiple references to assignments he worked on at the company. For example, he states that around 3:30 pm on May 28, 2019, Ms. Chapman told him he could go back to his hotel room because "[she] gave him several things to work on." (ECF No. 1, ¶ 15). Likewise, in the following paragraph of his complaint, Mr. Tambedou notes that on the evening of May 28, 2019, he "went back to his hotel and worked on the PowerPoint presentation for the Fiscal Year 2020 Resident Assessment Instrument." (*Id.*, ¶ 16). Mr. Tambedou further notes he completed the PowerPoint assignment on May 31, 2019 and "shared it with the group." (*Id.*).

Mr. Tambedou also states that the week prior to his termination, Ms. Chapman expressly stated her discontent with him. Specifically, she stated "I heard you want to make changes! You are not hired to change anything! Just observe and send reports to me in bullet points! You have all of these experiences, but it was for a smaller company!" (*Id.*). Ms. Chapman also explicitly stated during Mr. Tambedou's termination call that "[his] work

style did not match that of the company" and that "he did not meet expectations." (*Id.,* ¶ 17). Thus, "[a]s between th[e] obvious alternative explanation" for the termination, "and the purposeful, invidious discrimination [Mr. Tambedou] asks us to infer, discrimination is not a plausible conclusion." *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009). Again, Plaintiff has failed to plead a sufficient claim for racially motivated termination, and this aspect of his claim will be dismissed.

For the foregoing reasons, Mr. Tambedou has not stated any claim under Section 1981. Mr. Tambedou asserts that he may want to file a Title VII claim, now that he has exhausted administrative remedies. A Title VII claim, however, would also fail. Claims of discrimination in employment under Section 1981 and Title VII proceed under the same framework. *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004). Just as Plaintiff has failed to plead sufficient claims based on race, he fails to allege facts sufficient to plead discrimination based on religion or national origin as well. Thus, he has failed to state any federal claim. Plaintiff's remaining claims arise under state law. Under 28 U.S.C. § 1367(c)(3), the court has discretion to decline exercising supplemental jurisdiction over a claim if the court has dismissed all claims over which it has original jurisdiction. In *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726 (1966), the Supreme Court cautioned that "[n]eedless decisions of state law

13

should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." The *Gibbs* Court went on to say that "if the federal law claims are dismissed before trial . . . the state claims should be dismissed as well." *Id.* Accordingly, the court declines to exercise supplemental jurisdiction over Mr. Tambedou's state law claims.

## IV. Conclusion

For the reasons stated above, Plaintiff's claims will be dismissed, the state claims without prejudice. A separate order will follow.

          /s/
DEBORAH K. CHASANOW
United States District Judge
